## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **MWAMBA M. RUFFIN,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 3:19-CV-01270-NJR** |
| **FAIYAZ AHMED, STEPHEN RITZ, VIPIN K. SHAH, and, WEXFORD HEALTH SOURCES, INC.,** | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

For years, Plaintiff Mwamba Ruffin lived with a mass jutting from his left shoulder. As a prisoner in custody of the Illinois Department of Corrections ("IDOC"), Ruffin received medical care from doctors within the prison healthcare system and eventually learned the protruding lump was a lipoma.[1] (*See* Docs. 137-1 to 137-8). Typically, as a tumor of fatty tissue, lipomas are painless, harmless, and benign. (Docs. 137-10, pp. 21-23; 137-12, p. 20). Ruffin claims that his shoulder lipoma, a unique breed of intramuscular lipoma, caused extreme pain because it pressed on a nerve. (Docs. 147; 148).

While at Lawrence Correctional Center ("Lawrence") from December 2017 until October 2018, Ruffin visited Defendants Dr. Faiyaz Ahmed and Dr. Vipin Shah multiple times for various medical issues, including his lipoma. (Docs. 137-1 to 137-7; 137-1, p. 9; 137-9, p. 49). Dr. Ahmed worked as the medical director of Lawrence at the time, and Dr. Shah traveled to

---

[1] A lipoma is a "benign neoplasm of adipose tissue, composed of mature fat cells." *Lipoma*, STEDMAN'S MEDICAL DICTIONARY, 508010, Westlaw (database updated Nov. 2014).

different facilities to assist where needed. (Docs. 137-10, p. 74; 137-12, pp. 9-11, 33). In December 2017, a nurse referred Ruffin to a physician to address various medical complaints. (Doc. 137-1, pp. 50-54). Enter Dr. Ahmed.

Ruffin met with Dr. Ahmed nine times from December 2017 to September 2018. In his first visit with Dr. Ahmed, Ruffin reported ongoing foot pain within the last year, left shoulder and left thigh lumps present for two years, and persistent athlete's foot for a year. (*Id.* at pp. 56-59). Dr. Ahmed observed a two-inch by two-inch[2] soft, tender lump on Ruffin's left shoulder and a one-inch by one-inch soft lump on his lateral left thigh. (*Id.*). Ruffin also conveyed that the shoulder lump hurt. (*Id.*). This initial assessment resulted in prescriptions of Tolnaftate cream for the foot lesions and Famotidine for his chronic acid reflux, orders for a right-foot x-ray and lab tests, temporary low bunk/low gallery permits, and instructions to return in two weeks. (*Id.*). The original care plan included scheduling surgery for the left shoulder lump, a treatment that Dr. Ahmed abandoned. (*Id.* at p. 57). Dr. Ahmed testified that he made this note in the plan only because Ruffin requested surgery. (Doc. 137-10, p. 29). Two weeks after the first appointment, Ruffin met with Dr. Ahmed again. (Doc. 137-1, p. 60). In that visit, Dr. Ahmed reviewed Ruffin's recent foot x-ray. (*Id.*). Ruffin described his shoulder as "hurt[ing] real bad." (*Id.*). Dr. Ahmed prescribed a muscle rub for the foot soreness and Mobic (twice a day for six weeks) in response to Ruffin's complaints of pain. (*Id.*; Doc. 137-5, p. 64).

---

[2] The various measurements discussed throughout this Order fluctuate from inches to centimeters. The Court will use the unit of measurement recorded in the relevant medical records in evidence.

Months passed before Ruffin saw Dr. Ahmed again. In the meantime, Ruffin met with a non-party nurse practitioner ("NP") in April 2018. (Doc. 137-1, p. 64). In that visit, the NP followed up on his left shoulder and right foot. (*Id.*). Ruffin informed the NP that he stopped taking Mobic because the medication made him feel funny, his left shoulder still hurt, and his shoulder had been a problem for several years. (*Id.*). The NP swapped his Mobic prescription for extra strength Tylenol for four months and extended his low bunk/low gallery permits for another year. (*Id.*). She also decided to refer Ruffin's case to a physician to assess removal of the shoulder mass and directed that Ruffin have an x-ray when next available. (*Id.*). The next day Ruffin received an x-ray of his left shoulder. (*Id.* at p. 65). Within eleven days, Ruffin followed up with the same NP. (*Id.* at p. 66). Ruffin reported that his shoulder mass remained tender and continued to bother him. (*Id.*). He also mentioned that the Tylenol "help[ed] some" with pain. (*Id.*). The NP inspected the recent x-ray and noticed widening of Ruffin's acromioclavicular ("AC") joint. (*Id.*). After a physical assessment, the NP noted a full range of motion in the left shoulder and a baseball sized soft, tender mass present. (*Id.*). Ruffin left with instructions to continue the current regimen and with a referral to see Dr. Ahmed. (*Id.*).

At the end of April 2018, Ruffin had his third visit with Dr. Ahmed. At that time, Ruffin stated that he had experienced pain in his left shoulder for five years. (*Id.* at p. 68). He also reported trouble with his lower back throughout the preceding six months. (*Id.*). Dr. Ahmed assessed chronic left shoulder pain with a lipoma accompanied by a two-inch by two-inch area of swelling and AC separation, and a tender low back with chronic pain. (*Id.* at p. 69). After the visit, Dr. Ahmed submitted a request for orthopedic referral for the shoulder

issues, which he ultimately withdrew after a collegial review discussion with a non-party physician. (*Id.* at pp. 68, 70).

About six weeks later, Ruffin saw Dr. Shah for the first time concerning his lipoma. (*Id.* at p. 71). Ruffin mentioned that the lump on his left shoulder persisted for two to three years hurting on and off. (*Id.*). He also told Dr. Shah that he wanted the lump taken out. (*Id.*). Dr. Shah identified subcutaneous swelling in the area, but noted normal shoulder movement and overall motion and found no orthopedic concern. (*Id.*). Dr. Shah assessed a lipoma within a site of 3.5 inches by 3.5 inches and advised Ruffin to observe any changes in his shoulder and return if needed. (*Id.*; Doc. 137-12, pp. 13-20). Ruffin filed a grievance after this appointment detailing his ongoing shoulder pain and the continued denial of any surgical solution for his shoulder. (Doc. 60-1, pp. 27-29). Two months later, in August 2018, Dr. Ahmed saw Ruffin again. (Doc. 137-1, p. 73). Ruffin expressed that his shoulder caused a lot of pain. (*Id.*). Upon physical examination, Dr. Ahmed noted a five-inch by five-inch soft, swollen area on the top of Ruffin's left shoulder. (*Id.*). To reassure Ruffin regarding his cancer concerns, Dr. Ahmed performed a punch biopsy[3] by cleansing the skin, anesthetizing with lidocaine, extracting a specimen, and cauterizing the wound. (*Id.*; Docs. 137-5, p. 65; 137-10, pp. 47-48). The biopsy site was treated with triple antibiotic ointment and a band-aid. (Docs. 137-1, p. 73; 137-5, p. 65). Ruffin received ointment and band-aids to apply on the wound twice a day along with instructions to return to the clinic in two days. (Doc. 137-1,

---

[3] A punch biopsy is "any method that removes a small cylindric specimen for biopsy by means of a special instrument that pierces the organ directly, or through the skin, or a small incision in the skin." *Punch Biopsy*, STEDMAN'S MEDICAL DICTIONARY, 103550, Westlaw (database updated Nov. 2014).

p. 73). The punch biopsy triggered several follow-up visits for redressing, wound check-up, and treatment of a resulting infection. (*Id.* at pp. 74, 77-81, 85-88).

From August 20, 2018, to September 28, 2018, Ruffin visited with nurses eight times (primarily for wound redressing), Dr. Ahmed five times, and Dr. Shah once. During this time, his biopsy site was warm to the touch and red, for which Dr. Ahmed prescribed Tylenol and Bactrim, an antibiotic for infections, and ordered follow-up. (*Id.* at p. 74; Doc. 137-5, p. 65). Upon initial review of Ruffin's pathology report, Dr. Ahmed found the biopsy negative for pathologic changes. (Doc. 137-5, p. 82). Two days later, on August 22, 2018, Dr. Ahmed inspected Ruffin's wound, observed swelling and pus, diagnosed a biopsy site infection, and took a sample for culture testing. (Doc. 137-1, p. 77). He prescribed more Bactrim, daily packing changes, and a DTaP vaccine, and he issued a "no behind-the-back cuffing" permit for six months. (*Id.*). Ruffin filed another grievance describing his shoulder pain and lack of treatment before seeing Dr. Ahmed again the next week. (Docs. 60-3, pp. 99-100; 137-1, p. 81). Ruffin's wound was not healing, and the culture report was not yet available. (Doc. 137-1, p. 81). Dr. Ahmed took another sample for culture testing and noted a plan to refer Ruffin to a surgeon, indicating that the biopsy site was infected, painful, and not healing. (*Id.*; Doc. 137-2, p. 16). Shortly after this appointment, Dr. Ahmed and Defendant Dr. Stephen Ritz, the current Chief Medical Officer for Defendant Wexford Health Sources, Inc. ("Wexford"), discussed the surgical request in collegial review and denied the referral. (Docs. 137-1, p. 82; 137-2, pp. 16-17; 142-1, p. 5). In lieu of a surgical consultation, Dr. Ahmed agreed to an alternative treatment plan of on-site monitoring in the infirmary to ensure compliance with antibiotics and dressing changes. (Doc. 137-1, p. 82). In their next visit days later, Dr. Ahmed charted no

complaints from Ruffin, recorded that the biopsy site culture appeared negative, observed no discharge or reddening of the skin, and assessed that the wound was healing. (*Id.* at p. 83).

Though Dr. Ahmed instructed Ruffin to return in two weeks, Ruffin visited Dr. Shah about a week later. (*Id.* at pp. 83, 87). Ruffin stated that his shoulder lump had been present for five years, he felt pain, and the site was draining. (*Id.* at p. 87). Dr. Shah observed a subcutaneous lump with swelling and drainage and reviewed the results of Ruffin's second culture showing many staphylococcus bacteria. (*Id.*; Doc. 137-12, pp. 26-31). He prescribed Clindamycin, an antibiotic for the infection, ordered Ruffin to return in two weeks, and put in a referral request for an ultrasound. (*Id.*; Doc. 137-2, p. 19). In early September, Ruffin met with nurses several times for dressing changes, and eventually the wound healed and dressing changes were discontinued. (Doc. 137-1, p. 88). Meanwhile, Dr. Ahmed and Dr. Ritz discussed Dr. Shah's referral request for an ultrasound in collegial review and approved the request. (Doc. 137-2, p. 20).

Ruffin met with Dr. Ahmed again on September 14, 2018. (Doc. 137-1, p. 85). Dr. Ahmed noted the staphylococcus bacteria in the culture, found soft swelling at the top of Ruffin's shoulder measuring ten centimeters by seven centimeters, and recorded the area as warm and very tender. (*Id.*). Moving forward, Dr. Ahmed planned to schedule an incision drainage within the next couple weeks and to order labs. (*Id.*). Two weeks later, on September 28, 2018, Ruffin visited with Dr. Ahmed for the last time. (*Id.* at p. 95). Dr. Ahmed measured a slight growth in the left shoulder swelling at ten centimeters by eight centimeters, and found no redness or discharge. (*Id.*). He directed Ruffin to return four weeks after his ultrasound for a check-in. (*Id.*).

About a month later, Ruffin received an ultrasound of his left shoulder. (*Id.* at p. 96; Doc. 137-5, p. 70). The non-party radiologist interpreting the ultrasound found a well demarcated soft tissue lesion within the subcutaneous soft tissues superior to the left shoulder measuring at least 4.2 centimeters by 1.7 centimeters. (Doc. 137-5, p. 70). The radiologist listed his impression as, "Probable lipoma superior to the left shoulder. Would consider follow-up ultrasound for stability at 6 months." (*Id.*). In November 2018, Ruffin visited with Dr. Shah for the last time to follow up on the ultrasound. (Doc. 137-1, p. 96). Ruffin reported that his shoulder still hurt, caused a burning sensation, and created difficulty when lying on his left side. (*Id.*). Dr. Shah interpreted the ultrasound results as normal and revealing a lipoma. (*Id.*; Doc. 137-12, pp. 34-38). He planned to recheck the lipoma in five months, consistent with the radiologist's recommendation. (*Id.*).

On three occasions in 2019, Dr. Ritz participated in collegial review discussions regarding Ruffin's lipoma. (Docs. 137-2, pp. 21-22; 137-6, pp. 55-61). In February 2019, Ruffin met with a non-party treating physician who charted his complaints of constant pain, an enlarged and tender area on his left shoulder, and good range of motion in the shoulder. (Docs. 137-2, pp. 7, 21-22; 142-1, pp. 43-47). About a week later, Dr. Ritz and the treating physician discussed a referral for general surgery evaluation. (Docs. 137-2, pp. 8, 21-22; 142-1, pp. 43-47). The collegial review documentation listed that the lipoma, situated over the left AC joint, measured eight centimeters by ten centimeters, limited Ruffin's range of motion, created difficulty lying on his left side, and proved tender on palpation. (Doc. 137-2, pp. 21-22). They decided to continue the alternative treatment plan of monitoring Ruffin's lipoma onsite and reissuing a request for surgery if needed. (Docs. 137-2, pp. 8, 21-22; 142-1, pp. 43-47). A few months later, in June 2019, Dr. Ritz and the same non-party treating physician

conferred in collegial review again to review a new surgery referral request after the lipoma increased in size and Ruffin reported inability to sleep on his left side. (Docs. 137-2, p. 14; 137-6, pp. 55-58). The collegial review documentation noted significant increase in size of the lipoma from October 2018 to June 2019. (*Id.*). Again, they opted to continue the same alternative treatment plan to monitor the lipoma onsite, discuss current exam findings, and ensure compliance with previously recommended regimens. (Docs. 137-6, pp. 55-58; 142-1, pp. 47-49). A month later, Dr. Ritz approved an ultrasound referral in collegial review, after a request by the same non-party treating physician, who observed that the lipoma increased in size with pain, immobility, and continued issues lying on the left side. (Docs. 137-6, pp. 59-60; 142-1, pp. 50-53).

In October 2019, Ruffin transferred to Big Muddy River Correctional Center ("Big Muddy"). (Doc. 137-9, p. 49). While at Big Muddy, in March 2021, a non-party physician submitted a request for a surgery consultation to collegial review for Ruffin's left shoulder lipoma, which was initially denied, but then reevaluated and approved. (Doc. 137-8, pp. 10, 21-22). The eventual approval indicated that the lipoma had increased in size from 4.2 by 1.8 centimeters in 2018 to 4.6 by 1.8 centimeters in 2019 then to 4.7 by 2.9 centimeters in March 2021. (*Id.*). Dr. Miller, a non-party, outside surgeon, saw Ruffin at the end of April 2021, at which time he observed the lipoma had grown to over five centimeters in diameter. (Docs. 137-8, p. 20; 137-11, p. 22). He performed surgery on August 13, 2021. (Docs. 137-8, p. 24; 137-11, p. 14). The mass removed from Ruffin was a benign, lobulated, deep intramuscular lipoma. (Doc. 137-11, pp. 14-15, 17). For visualization, the lipoma could fit inside an Easter egg. (*Id.* at pp. 27-28). Dr. Miller testified that lipomas can be painful when

pressing on adjacent nerves and typically remain so until excised. (*Id.* at pp. 10-11, 13). He assessed that Ruffin's pain was "definitely associated" with his lipoma. (*Id.* at 15).

In his deposition, Ruffin stated that he first noticed his shoulder lump at the beginning of his time in custody, possibly as early as 2010. (Doc. 137-9, pp. 13-15). He first visited a physician for the lump at Stateville Correctional Center in 2014 or 2015. (*Id.* at p. 16). Concerning his experience at Lawrence, Ruffin testified that he felt a stinging and burning pain in his shoulder when he worked out, raised his hand or arm past the shoulder level, lifted overhead, or slept on his left side. (*Id.* at pp. 27-28, 62-65). Ruffin also testified that, during that time, his shoulder pain at rest rated at an eight out of ten, and ten out of ten with physical exertion. (*Id.* at pp. 63-64). Moreover, he recalled that the prescribed medication failed to mitigate his pain. (*Id.* at pp. 79-80, 113). Throughout his time at Lawrence, Ruffin worked within dietary in the kitchen. (*Id.* at pp. 67-70). He generally worked five days a week for eight hours a day. (*Id.*). After his surgery in August 2021, Ruffin testified that he now experiences only tolerable, poking pain in his shoulder when performing push-ups and working out. (*Id.* at p. 53).

Ruffin filed this action *pro se* under 42 U.S.C. § 1983 for a violation of his constitutional rights in his medical treatment at Lawrence, among other claims. (Doc. 2). Ruffin has been housed at several IDOC institutions, but he is currently incarcerated at Hill Correctional Center.[4] The Court appointed counsel for Ruffin in May 2021. (Doc. 91). He proceeds on two counts, one for deliberate indifference in treating his lipoma and associated pain against Dr. Ahmed, Dr. Shah, Dr. Ritz, and Wexford in violation of the Eighth Amendment, and one

---

[4] *See* https://idoc.illinois.gov/offender/inmatesearch.html (last visited Sept. 14, 2023).

under Illinois state law for medical negligence against all defendants. (Doc. 14).

Currently pending before the Court are two motions for summary judgment: one filed by Dr. Ahmed (Doc. 137), and one jointly filed by Dr. Shah, Dr. Ritz, and Wexford. (Doc. 142). Ruffin filed a timely response to each motion (Docs. 147; 148), and Defendants filed timely replies. (Docs. 158; 161). Defendants argue that Ruffin cannot set forth any evidence of deliberate indifference to a serious medical need and that he failed to provide the requisite affidavit, report, or testimony to pursue a claim under Illinois law for medical negligence. As such, they urge the Court to grant summary judgment in their favor on all counts. Alternatively, Ruffin argues that many genuine issues of material fact exist as to the deliberate indifference claims and, thus, summary judgment is improper. Ruffin made no argument opposing summary judgment on his medical negligence claims.

## LEGAL STANDARD

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Assertions that a fact cannot be or is genuinely disputed must be supported by materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials. FED. R. CIV. P. 56(c)(1). The moving party bears the burden of establishing that no material facts are in genuine dispute; any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970); *see also Lawrence v. Kenosha Cty.*, 391 F.3d 837, 841 (7th Cir. 2004).

Once the moving party sets forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts

showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). A moving party is entitled to judgment as a matter of law where the nonmoving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp.*, 477 U.S. at 323. The party opposing summary judgment must offer admissible evidence in support of his version of events; hearsay evidence does not create a genuine issue of material fact. *Durling v. Menard, Inc.*, No. 18 C 4052, 2020 WL 996520, at *2 (N.D. Ill. Mar. 2, 2020) (citing *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 484 (7th Cir. 1996)). "Inferences that rely upon speculation or conjecture are insufficient." *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (internal citation omitted).

## ANALYSIS

### I.   Eighth Amendment Deliberate Indifference to Medical Needs

As recognized by the Supreme Court, "deliberate indifference to serious medical needs of prisoners" can constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The Constitution proscribes deliberate indifference to serious medical needs of prisoners that amounts to the unnecessary and wanton infliction of pain. *Stockton v. Milwaukee Cty.*, 44 F.4th 605, 614 (7th Cir. 2022). A prisoner is entitled to "reasonable measures to meet a substantial risk of serious harm"—not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). As such, a prisoner's dissatisfaction with a medical provider's prescribed course of treatment does not give rise to a successful deliberate indifference claim unless the treatment is "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's

condition." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). The Eighth Amendment does not reach disputes concerning the exercise of a professional's medical judgment, and disagreement between a prisoner and his doctor, or even between two medical professionals, regarding the proper course of treatment is generally insufficient to show deliberate indifference. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *Cesal v. Moats*, 851 F.3d 714, 721 (7th Cir. 2017).

To succeed on a claim of deliberate indifference, a plaintiff must show: (1) that he suffered from an objectively serious medical condition; and (2) that the individual defendant was deliberately indifferent to that condition. *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). A medical condition is objectively serious if "a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (quoting *Pyles*, 771 F.3d at 409). The prisoner's condition need not be life-threatening to be serious, rather it can be serious if it would result in further significant injury or unnecessary and wanton infliction of pain if untreated. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). To prevail on the second prong, a prisoner must show that a prison official has subjective knowledge of—and then disregards—an excessive risk to prisoner health. *Greeno v. Daley,* 414 F.3d 645, 653 (7th Cir. 2005). A plaintiff need not show the official "literally ignored" his complaints, but that the official was aware of the condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Something more than negligence or even malpractice is required" to prove deliberate indifference. *Pyles*, 771 F.3d at 409. Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry*, 604 F.3d at 440 (citing *Gayton*, 593 F.3d at 620).

Assessing the subjective prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). This is in contrast to a case "where evidence exists that the defendant[ ] knew better than to make the medical decision[ ] that [he] did." *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016)) (alterations in original). A medical professional's choice of an easier, less efficacious treatment can rise to the level of violating the Eighth Amendment where the treatment is known to be ineffective but is chosen anyway. *Berry*, 604 F.3d at 441; *Greeno*, 414 F.3d at 655. A delay in treating a non-life-threatening but painful condition may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged the prisoner's pain. *Arnett,* 658 F.3d at 753 (citing *McGowan v. Hulick,* 612 F.3d 636, 640 (7th Cir. 2010)).

### a.  Objective Prong - Serious Medical Condition

Regarding the objective prong, while Dr. Ahmed's motion is separate from the other Defendants, Dr. Shah, Dr. Ritz, and Wexford endorsed and adopted all of Dr. Ahmed's arguments within their motion and added some of their own. For overlapping arguments, the Court will refer to Defendants collectively.

Defendants argue that Ruffin cannot establish that he suffered from an objectively serious medical condition. In support of their arguments, Defendants cite several district court and Seventh Circuit cases finding that a lipoma did not qualify as a serious medical condition. Urging the Court to find the same here, Defendants assert that Ruffin's lipoma did not impact his range of motion, disturb his normal full-time work in the kitchen, or show any signs of cancer. Moreover, Ruffin lived for several years with the lipoma without issue.

According to Defendants, Ruffin's medical providers recommended removal years after his time at Lawrence because the lipoma increased in size. Defendants also contend that Ruffin's complaints of pain cannot transform his lipoma into a serious medical condition because, while he consistently mentioned shoulder pain, in their medical assessments, the pain aligned more with discomfort rather than serious pain, especially considering objective measures like range of motion, presentation in each visit, and Ruffin's ability to carry on normal daily activities.

In contrast, Ruffin argues that the medical records—paired with the testimony in evidence—tell the story of persistent, chronic pain related to his lipoma. Ruffin points to his testimony that the pain medication had no impact on his pain levels. His inability to sleep on his left side and difficulty working out, according to Ruffin, demonstrate that the lipoma and associated pain interrupted his daily activities. The medical records also demonstrate that the lipoma gradually increased in size. After the lipoma excision in 2021, Ruffin's surgeon testified that the lipoma was intramuscular, pushing into the muscle, and definitely associated with Ruffin's persistent shoulder pain.

While the Seventh Circuit has never decided that lipomas categorically do not qualify as a serious medical need, it is well established that lipomas are generally painless, harmless, and benign. *See Gallo v. Sood*, 651 F. App'x 529, 531, 534 (7th Cir. 2016). Because Ruffin's lipoma has now been removed, it is certain that his lipoma, in and of itself, was benign and harmless. But Ruffin reported left shoulder pain consistently in most of his medical appointments. He testified that sleeping on his left side aggravated his condition, as did exercise. After excision, his shoulder lipoma proved to be intramuscular and pushing into the muscle—the rare kind that can cause pain. Ruffin also had a lipoma on his leg for which

he raised zero complaints of pain and did not request surgery. Moreover, Dr. Ahmed and other non-party medical providers submitted collegial requests for surgical consultation, possibly showing that at least one physician diagnosed the shoulder lipoma as requiring treatment during the relevant time period. On the other hand, his complaints of pain associated with his lipoma varied in degree, and Dr. Shah testified that Ruffin did not appear to be in any kind of serious pain. Moreover, the medical records indicate that Ruffin self-reported the medication as helping some. The documentation shows—that in at least some visits—Ruffin's range of motion in his shoulder remained unaffected. There is also evidence that Ruffin maintained steady employment in prison working a full-time job in the kitchen performing at least some physical tasks unimpeded by his purported pain.

The Court cannot resolve or weigh these facts. That task is left to the jury. Weighing this evidence, a reasonable jury could determine that Ruffin suffered from a serious medical condition to satisfy the objective prong. Thus, summary judgment is not appropriate on this basis.

### b. **Subjective Prong – Deliberate Indifference**

Turning to the subjective prong, according to Defendants, each medical provider acted within his professional judgment to provide appropriate, conservative treatment to Ruffin. Defendants contend that they adequately addressed Ruffin's steady complaints of pain through medication, low bunk and gallery permits, "no behind-the-back cuffing" orders, and appropriate treatment when an infection arose. Moreover, Ruffin presented with normal range of motion and movement on multiple occasions. The treatment plan used for Ruffin included frequent follow-up visits to monitor the growth and ongoing issues related

to the lipoma. According to Defendants, they each assessed the lipoma as a cosmetic issue only, which did not pose a risk of cancer.

On the other hand, Ruffin argues that Defendants refused to refer him to a surgeon for removal of his lipoma. He contends that Defendants essentially ignored his consistent, ongoing complaints of pain by writing the lipoma off as cosmetic. The prescribed pain medication, according to Ruffin, did little to quell his pain. Ruffin notes that Dr. Ahmed specifically charted a referral for a surgical consultation in his patient notes, but claims to have done so simply to appease Ruffin. Even so, Ruffin argues that this demonstrates Dr. Ahmed's subjective knowledge of the seriousness of Ruffin's condition. Additionally, Ruffin points out that his lipoma grew while in Defendants' care. Overall, Ruffin maintains that Defendants' failure to refer him for surgery delayed his treatment and ultimately prolonged his pain.

To satisfy this element, Ruffin must show that each individual defendant had subjective knowledge of—and then disregarded—an excessive risk to his health. The Court will evaluate each defendant separately to determine whether a genuine issue of material fact exists as to their sufficiently culpable states of mind.

### i. <u>Dr. Ahmed</u>

Dr. Ahmed treated Ruffin on nine occasions in a nine-month period. At each appointment, Ruffin presented with a lump on his shoulder. He consistently complained of shoulder pain during—and beyond—his visits with Dr. Ahmed. The medical records indicate that Ruffin complained of shoulder pain at least six times directly to Dr. Ahmed. He also wrote two grievances in the summer of 2018, complaining about the very painful lump on his shoulder. In April 2018, Dr. Ahmed assessed that Ruffin suffered chronic shoulder pain.

Dr. Ahmed prescribed pain medication on two occasions[5]—Mobic on December 12, 2017, and Tylenol on August 20, 2018 (after speaking with a nurse who examined Ruffin). In their initial appointment, Dr. Ahmed provided low bunk/low gallery permits, which an NP later renewed for 12 months. After Ruffin's shoulder became infected, Dr. Ahmed provided a six-month "no behind-the-back cuffing" order. Dr. Ahmed directed Ruffin to return to the clinic for follow-up on four occasions. In April, Dr. Ahmed noted that Ruffin's shoulder x-ray showed AC joint separation and claims to have attributed the shoulder pain to that condition. In August, Dr. Ahmed performed a punch biopsy, which he testified was only necessary to reassure and satisfy Ruffin about his cancer concerns.

The medical records indicate that Dr. Ahmed charted surgical referral in the care plan section of his notes for three visits. He did not actually submit the first referral request, withdrew the second request after discussion in collegial review, and participated in collegial review denying the last request. Dr. Ahmed testified that he wrote these notes because Ruffin asked for surgery, not because he believed it was medically necessary. He said that he agreed to submit referrals just to please Ruffin, and then he would report back that he did refer, but Wexford denied the referral because the request did not align with the standard of care. After the referral withdrawal and denial, Dr. Ahmed participated in collegial review and agreed to an alternative treatment plan of on-site monitoring. After Ruffin continued his complaints of pain with another physician who submitted an ultrasound request, Dr. Ahmed participated in collegial review and approved the ultrasound request.

---

[5] Ruffin also received a four-month extra strength Tylenol prescription from an NP in early April. Eleven days later, he saw the NP again and reported that the Tylenol "help[ed] some."

Notably, in each visit with Ruffin, the medical records do not reflect that Dr. Ahmed evaluated range of motion or other objective methods to assess Ruffin's subjective complaints of pain. Throughout his deposition, Dr. Ahmed insisted that lipomas, as a benign condition, do not cause pain or hurt anyone. Dr. Ahmed also testified that Ruffin had two lipomas, but never complained about the one on his thigh. From that, Dr. Ahmed reasoned that if one of them hurt, both should hurt. Moreover, he identified the AC separation as a possible cause of Ruffin's chronic shoulder pain.

Because lipomas are generally harmless and cosmetic issues, Dr. Ahmed argues that there is no evidence that he was aware of, and then disregarded, a substantial risk of serious harm to Ruffin's health. He contends that he did not ignore Ruffin's complaints of pain as he prescribed pain medication, low bunk/low gallery permits, and monitored the lipoma. In light of Ruffin's concerns of cancer, Dr. Ahmed avers that he performed a punch biopsy for reassurance. Moreover, he submitted Ruffin's case to collegial review for outside surgical consultation. Dr. Ahmed viewed the lipoma as a cosmetic condition, and the surgical consultations were denied just as an insurance company would likely not cover an elective procedure for a non-prisoner patient. Overall, Dr. Ahmed insists that there is no evidence he acted with a sufficiently culpable state of mind required to substantiate a claim of deliberate indifference.

Alternatively, Ruffin urges that the record contains evidence of ongoing pain complaints directly conveyed to Dr. Ahmed and other providers, the ineffectiveness of pain medication, and Dr. Ahmed's decision to simply monitor the lipoma without taking concrete steps to address the pain or assess its underlying cause. Ruffin highlights Dr. Ahmed's three treatment plan notes for referral to surgery to show that Dr. Ahmed knew of Ruffin's serious

condition and need for surgical consult and that Dr. Ahmed chose to disregard that need. Further, Ruffin argues that, while by initial appearance Dr. Ahmed attempted to coordinate surgical referral, during his deposition, Dr. Ahmed made clear that these supposed plans for referral constituted mere lip service. A genuine issue of material fact exists, according to Ruffin, as to whether Dr. Ahmed persisted in an ineffective course of treatment knowingly, and without regard to Ruffin's pain.

The Court agrees with Ruffin. At first glance, the medical records appear to support Dr. Ahmed's assertions. He devoted attention to Ruffin's complaints, prescribed pain medication for his pain, submitted surgical referral requests on two occasions, continued to monitor the lipoma, and attempted to treat Ruffin's condition conservatively within his medical judgment. He did, in fact, prescribe Mobic in the first couple of visits and wrote low bunk/low gallery permits. Ruffin then received extra strength Tylenol from an NP from April to August. In August, Dr. Ahmed prescribed a lower dosage Tylenol for Ruffin's infection along with a "no behind-the-back cuffing permit." Dr. Ahmed performed a punch biopsy to alleviate cancer concerns and instructed Ruffin to follow-up as needed several times. He also participated in collegial review and approved an ultrasound request for Ruffin's shoulder in September.

But a more thorough review of the record reveals genuine issues of material fact regarding Dr. Ahmed's potential deliberate indifference to Ruffin's painful lipoma. There is evidence that Ruffin consistently reported left shoulder pain to every medical provider he saw, including Dr. Ahmed. In fact, Dr. Ahmed diagnosed Ruffin as having chronic shoulder pain and repeatedly described the shoulder as swollen and tender. Despite these complaints, Dr. Ahmed remained obstinate in his belief that lipomas never cause pain. He did not reassess

the medication regimen or change anything in light of the persistent pain. Nor did he consider the possibility that Ruffin's lipoma was of the rare variety that presses into a muscle or nerve and causes pain. While the surgical referral requests give the appearance that Dr. Ahmed attempted to advance Ruffin's care, Dr. Ahmed's own testimony provides evidence that he never seriously pursued this path of treatment. His referrals and participation in collegial review, by his own testimony, could have been disingenuous, not rooted in medical judgment, and intended to give the illusion of effort. Moreover, after excision in 2021, Ruffin's surgeon confirmed that the lipoma was intramuscular, pressing into the muscle, and associated with his pain.

To be sure, the record also contains evidence that Ruffin maintained a laborious job working in the kitchen for 40 hours a week. In an x-ray ordered by another provider, Ruffin's AC joint showed separation, which was a possible source of his pain. He also showed a good range of motion in appointments with other providers. Dr. Ahmed's patient care notes, however, are devoid of any reference to physical examinations, range of motion evaluations, or other indicators that Ruffin's subjective complaints of pain contradicted any objective measure of pain.

A jury, weighing this evidence, could infer that Dr. Ahmed demonstrated deliberate indifference in failing to meaningfully treat Ruffin's painful lipoma. Certainly, prisoners are not entitled to the best possible care, and they have no constitutional guarantee of living pain-free. *Arnett,* 658 F.3d at 754; *see Snipes*, 95 F.3d at 592. But even when a doctor may not completely ignore a prisoner's pain, that doctor's choice of the easier, less efficacious treatment can still amount to deliberate indifference. *Berry*, 604 F.3d at 441. When a physician persists in a course of treatment known to be ineffective, resulting in a prisoner suffering

prolonged and unnecessary pain, that physician violates the Eighth Amendment. *Greeno*, 414 F.3d at 655.

On this record, a reasonable jury could find that Dr. Ahmed acted with a criminally reckless state of mind by allowing Ruffin's pain to go untreated, persisting in a treatment known to be ineffective, and submitting surgical requests to appease Ruffin without actually seeking a solution for his ongoing pain. A jury may also find that this conduct stands far afield of accepted professional standards. Alternatively, a jury may be convinced that Dr. Ahmed was simply mistaken in his honest, appropriate professional judgment. Because genuine issues of material fact exist, Dr. Ahmed is not entitled to summary judgment.

### ii. Dr. Shah

Turning to Ruffin's other treating physician at Lawrence, Dr. Shah evaluated Ruffin three times. In the first visit, Ruffin described the pain in his shoulder as "on and off." Dr. Shah conducted a physical examination, measured the mass, and recorded normal movement and range of motion in the shoulder. He assessed that the lipoma presented no orthopedic concern. Ruffin next met with Dr. Shah after Dr. Ahmed performed a punch biopsy. In this second visit, Ruffin reiterated his pain and described drainage at the biopsy site. Dr. Shah detected a staph infection, along with swelling and drainage. He focused on treating the infection with antibiotics and submitted a referral request for an ultrasound. He also instructed Ruffin to return in two weeks to continually monitor his condition and ongoing infection. During their last appointment, about two months later, Dr. Shah reviewed Ruffin's ultrasound results. The ultrasound revealed a lipoma as suspected. Ruffin continued to report pain, including a burning sensation, and difficulty lying on his left side. Dr. Shah

planned to reevaluate the lipoma within five months, consistent with the off-site radiologist's recommendation.

Dr. Shah argues that after his initial visit with Ruffin in June, he did not recommend surgery because lipomas are common, and he typically does not recommend surgery unless a serious issue exists. In his next visit in September, he asserts that he referred Ruffin for an ultrasound due to softness in the lipoma and wanted to confirm the presence of cystic swelling, which could alter his treatment plan. Lastly, Dr. Shah contends that, in reviewing Ruffin's ultrasound in November, he considered the risks and benefits of surgery and assessed that Ruffin did not suffer from serious pain. As such, he excluded Ruffin as a candidate for surgery at that time. To the contrary, Ruffin argues that Dr. Shah knew that the lipoma induced pain and that Ruffin struggled to lie on his left side. The fact that none of their three visits resulted in a surgical consultation referral, according to Ruffin, demonstrates that Dr. Shah acted with deliberate indifference to Ruffin's ongoing pain.

Notably, when he first met with Dr. Shah, Ruffin had an active extra strength Tylenol prescription. Ruffin provided consistent complaints of pain across the three visits, but in the first visit he indicated that his shoulder hurt "on and off." Upon physical examination, Dr. Shah found normal shoulder movement and range of motion and found no orthopedic concern. Dr. Shah treated Ruffin's infection through antibiotics. Unlike Dr. Ahmed, Dr. Shah advanced the treatment of Ruffin's shoulder by requesting an ultrasound. After the ultrasound, Dr. Shah met with Ruffin for the final time and planned to recheck the lipoma in five months, consistent with the radiologist's recommendation.

On this record, a reasonable jury could not find Dr. Shah to be deliberately indifferent within these few-and-far-between interactions. Dr. Shah's medical notes evince his efforts to

assess the subjective complaints of pain with objective measures and to request further testing through ultrasound. Ultimately, Dr. Shah made the decision to reevaluate the lipoma at a later time, agreeing with the radiologist's suggested course of action. Ruffin points to this decision as evidence of deliberate indifference, however, at most, it is a disagreement in the course of treatment. *See Snipes,* 95 F.3d at 591 (mere disagreement with a course of medical treatment does not constitute an Eighth Amendment violation). This is different from Dr. Ahmed, where there is evidence suggesting he knowingly persisted in an ineffective course of treatment over a substantial period of time, and did not rely on his medical judgment but acted simply to appease Ruffin. The undisputed evidence demonstrates that Dr. Shah used acceptable medical judgment throughout each of these interactions and attempted to progress Ruffin's treatment.

No reasonable jury, considering this record, could find that Dr. Shah demonstrated deliberate indifference to Ruffin's serious medical need. As such, Dr. Shah is entitled to summary judgment.

### iii.  Dr. Ritz

Dr. Ritz never met with Ruffin, but evaluated the care plan for Ruffin in five instances. Overall, Dr. Ritz approved two ultrasounds to monitor the size of Ruffin's lipoma and denied three requests for surgical consultation, advising Ruffin's treating physicians to pursue alternative treatment plans of continued on-site monitoring and re-presentation if warranted. In the first referral reviewed by Dr. Ritz, Ruffin's lipoma had an infection, and Dr. Ritz recommended a plan of on-site monitoring for compliance with the infection management regimen. In the next referral review, Dr. Ritz approved Dr. Shah's request for ultrasound. Six months later, Dr. Ritz followed up on Ruffin's condition with a non-party treating physician,

where the two decided to continue on-site monitoring. About three months after that, Dr. Ritz followed up on Ruffin's condition again with the same plan of continued monitoring. A month later, in his final involvement in Ruffin's treatment, Dr. Ritz approved an ultrasound again to reassess the size of the lipoma.

Dr. Ritz argues that he approved two ultrasounds and worked with the on-site medical directors to develop alternative treatment plans instead of surgical consultation. He contends that he based all of his decisions within the collegial review process in his professional, medical judgment that lipomas typically do not require an immediate referral for surgery. In opposition, Ruffin asserts that Dr. Ritz's surgical denials resulted in a two-year delay in receiving specialty care for his lipoma and prolonged his pain unnecessarily.

The record reflects that Dr. Ritz had at least some knowledge of the ongoing shoulder pain suffered by Ruffin. The referral requests evaluated by Dr. Ritz in collegial review included information about Ruffin's persistent complaints of pain, inability to lie on his left side, lipoma growth, and swelling and tenderness in his shoulder area. Despite these well-documented and ongoing issues, Dr. Ritz persisted in a treatment of continued on-site monitoring. He did approve two ultrasound requests. But the ultrasounds only provided information about the size of the lipoma, not whether the lipoma pushed against a nerve or muscle, as a potential source of his chronic pain. While Dr. Ritz played no active role in monitoring, treating, or evaluating Ruffin, his actions possibly hindered the ability of Ruffin's treating physicians to adequately treat his chronic pain.

On this record, a reasonable jury could find that Dr. Ritz acted with a criminally reckless state of mind by preventing Ruffin's physicians from treating his pain and persisting in a treatment known to be ineffective over a long period of time. On the other hand, a jury

could assess the evidence and determine that Dr. Ritz used appropriate medical judgment in conservatively treating a typically harmless condition. Because genuine issues of material fact exist, Dr. Ritz is not entitled to summary judgment.

### iv.  Wexford Health Sources, Inc.

Ruffin proceeds on a claim against Wexford under *Monell*. Wexford's liability is governed by *Monell*, because, although Wexford is a private corporation, in providing medical care to prisoners it acts under the color of state law. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). A private corporation, like Wexford, who contracts to provide essential government services, can be held liable under 42 U.S.C. § 1983 only if the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself. *Shields v. Ill. Dep't of Corrections*, 746 F.3d 782, 792-96 (7th Cir. 2014) (followed precedent but questioned extension of *Monell* to private corporations); *Whiting*, 839 F.3d at 664.

To succeed on his claim against Wexford, Ruffin must show "that a violation of his Eighth Amendment rights was caused not only by a Wexford agent or employee but by a corporate policy or widespread practice or custom." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 652 (7th Cir. 2021) (citing *Monell v. Dep't of Social Services*, 436 U.S. 658, 690-91 (1978)). The policy or practice "must be the direct cause or moving force behind the constitutional violation." *Woodward v. Correctional Medical Services of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (internal quotation marks omitted). While there is no bright-line rule for the quantity, quality, or frequency of conduct needed to prove a custom or practice, one key in applying *Monell* is to distinguish between isolated incidents of wrongdoing and other, more widespread practices. *Howell*, 987 F.3d at 654.

In its motion for summary judgment, Wexford argues that Ruffin has not identified, and the record is devoid of, any written policy regarding lipoma treatment and specialty care referrals. Wexford also contends that the record contains no evidence of an unwritten policy, especially not one that is so permanent and widespread as to constitute a custom or usage with the force of law. Further, Wexford maintains that Ruffin cannot demonstrate that any purported policy acted as the moving force of a constitutional violation. In opposition, Ruffin argues that Dr. Ahmed, in his deposition, admitted that Wexford had a policy prohibiting surgical referrals for lipomas. Ruffin also testified that a physician at Lawrence told him that lipomas are cosmetic issues and Wexford, per its policy, would not do anything for cosmetic issues.

Here, as to Dr. Ahmed and Dr. Ritz, a constitutional violation possibly occurred. The question now becomes, did a policy or custom at Wexford cause the constitutional violation? In his deposition, when asked, "Is it your understanding that it's Wexford's policy that lipomas are harmless and they're cosmetic, and, therefore, Wexford will not approve of specialty referrals for lipomas?" Dr. Ahmed replied, "Yup. Yeah." Ruffin points to this testimony as direct evidence that Wexford has such a policy. Before this question, however, Dr. Ahmed stated, "Wexford will not approve because this is against the standard of care." After the question, Dr. Ahmed went on to explain, "Wexford said, 'No. This is standard of -- is not a standard of care, and this is a -- will not be approved.'" Cherry-picking one part of this exchange cannot transform this innocuous response into an absolute admission. Dr. Ahmed's testimony, as a whole, described that the standard of care for lipomas is typically to leave them alone, as they are usually harmless and benign. He expressed that Wexford followed this standard of care. Ruffin also points to his testimony that a physician

at Lawrence told him about Wexford's policy to refuse treatment of cosmetic issues. This constitutes hearsay. Even if Wexford did have a policy refusing to treat cosmetic issues, such policy would not be implicated here. While lipomas are normally cosmetic, in Ruffin's case and in other cases where lipomas cause pain or grow too large, the issue is no longer cosmetic. Further, Wexford eventually approved surgical removal of Ruffin's lipoma in 2021.

Ruffin has not identified any particular policy or custom employed by Wexford that caused a constitutional violation. He highlights Dr. Ahmed's testimony, however, as explained above, that evidence does not pack quite the punch that he proclaims. Moreover, Ruffin asserts that other medical providers told him about this Wexford policy. Such an assertion is inadmissible hearsay and cannot be considered on summary judgment. Because Ruffin has not set forth any other evidence to demonstrate an unconstitutional policy or custom employed by Wexford, summary judgment in favor of Wexford is appropriate.

## II.   Illinois Medical Negligence

Under Illinois law, a plaintiff pursuing a medical negligence claim must file an affidavit that "there is a reasonable and meritorious cause" for litigation of the claim, along with a physician's report in support of the affidavit. *See* 735 ILCS § 5/2-622. This requirement applies to malpractice litigation in federal court because Section 5/2-622 is a substantive condition of liability. *Hahn v. Walsh*, 762 F.3d 617, 633 (7th Cir. 2014). Summary judgment affords the proper opportunity for disposing of a medical malpractice claim in federal court for failure to comply with Section 5/2-622. *Young v. United States*, 942 F.3d 349, 350-51 (7th Cir. 2019).

Pursuant to this Court's Order on July 21, 2021, Ruffin received an additional 120 days to file the requisite affidavit described in Section 5/2-622 or amend his Complaint to dismiss

that claim. (Doc. 101). Ruffin did not file the necessary affidavit and report or amend his Complaint. Defendants argue that, because Ruffin has failed to satisfy the requirements of Section 5/2-622, dismissal is mandatory. Ruffin offered no argument as to this claim in his response to either motion for summary judgment.

The Court finds that Ruffin failed to satisfy the requirements of Section 5/2-622, and waived any argument to the contrary, in pursuit of his claim of medical negligence under Illinois law. As such, Defendants are entitled to summary judgment on Ruffin's medical negligence or malpractice claims.

<h2 style="text-align:center">CONCLUSION</h2>

For the reasons set forth above, the Motion for Summary Judgment filed by Dr. Faiyaz Ahmed (Doc. 137) is **GRANTED in part** as to the medical negligence claim and **DENIED in part** as to the deliberate indifference claim. Further, the Motion for Summary Judgment filed by Dr. Vipin Shah, Dr. Stephen Ritz, and Wexford Health Sources, Inc. (Doc. 142) is **GRANTED in part** as to the medical negligence claims, the deliberate indifference claim against Dr. Shah, and the *Monell* claim against Wexford Health Sources, Inc. and **DENIED in part** as to the deliberate indifference claim against Dr. Ritz. The Court will set a status conference by separate order to select a firm trial date and discuss the remaining steps to resolve this case.

**IT IS SO ORDERED.**

**DATED:  September 15, 2023**

_____

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**